# United States Court of Appeals
## For the First Circuit

Nos. 23-1208, 23-1211

UNITED STATES,

Appellee,

v.

JAIRO HUERTAS-MERCADO; ERICK PIZARRO-MERCADO,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Rikelman, Circuit Judges.

Mauricio Hernandez Arroyo, for appellant Jairo Huertas-Mercado. José R. Gaztambide-Añeses, for appellant Erick Pizarro-Mercado.

Ricardo A. Imbert-Fernández, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Maríana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

July 30, 2025

**THOMPSON, Circuit Judge.** Jairo Huertas-Mercado ("Huertas") and Erick Pizarro-Mercado ("Pizarro") are maternal cousins and "best friend[s]" turned codefendants from Loiza, Puerto Rico. In September 2022, after a long-drawn-out, for reasons to be explained, pretrial process culminating in a one-week jury trial in the District Court for the District of Puerto Rico, Huertas and Pizarro were found guilty of crimes including, inter alia, six carjackings and two kidnappings -- one resulting in death. Both cousins were sentenced to terms of life in prison plus more for their offenses. The two kinsmen now come before this court bringing a boatload of bones to pick: constitutional speedy trial right grievances, evidence insufficiency quibbles, sentencing unreasonableness grouses, and double jeopardy plaints. We will flesh out the cousins' arguments and analyze the merits as we proceed, but, for now, it suffices to say that the arguments all fail and that the appellants' requests for relief are all denied.

### BACKGROUND

We begin, as usual, by outlining the background facts relevant to the appellants' claims on appeal. In our review of the facts relative to the constitutional speedy trial claim, which Huertas raises, and which we will tackle first when we get to the Discussion, we'll describe the details of the proceedings below with particularity and in a balanced fashion. See United States

- 2 -

v. Felton, 417 F.3d 97, 99 (1st Cir. 2005) (explaining that appellate claims other than sufficiency-of-the-evidence challenges may require a balanced factual treatment); see also United States v. Loud Hawk, 474 U.S. 302, 305 (1986) (explaining that "[i]n view of the nature of respondents' [speedy trial] claim, we state the factual and procedural history of this case in some detail"). As for Huertas and Pizarro's sufficiency-of-the-evidence challenges, we'll rehearse the facts underlying their convictions in the manner most favorable to the jury's verdict, though the essential facts here are not reasonably disputed by either appellant.[1] See United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015). In so doing, we will draw the relevant facts primarily from the

---

[1] Seventeen Counts were charged in the operative indictment. Huertas was charged in Counts One through Sixteen, while Pizarro was charged in Counts One through Seven and Counts Ten through Sixteen. We'll get to the details of the crimes charged, but, for now, we note that Counts One, Two, and Three charged carjacking, 18 U.S.C. §§ 2119(1), 2, kidnapping, 18 U.S.C. §§ 1201(a)(1), 2, and discharge of a firearm in furtherance of those crimes of violence against Bryant Myers, 18 U.S.C. §§ 924(c)(1)(A)(ii)-(iii), 2; Counts Four through Thirteen charged carjackings and the brandishing of firearms in furtherance of said crimes of violence relative to other victims; Counts Fourteen, Fifteen, and Sixteen charged the kidnapping resulting in death of Luis Manuel Saenz-Matias, 18 U.S.C. §§ 1201(a)(1), 2, the discharge of a firearm in furtherance of that crime of violence, 18 U.S.C. §§ 924(c)(1)(A)(iii), 2, and the discharge of a firearm in furtherance of that crime of violence causing murder, 18 U.S.C. §§ 924(j)(1), 2. Neither cousin was charged in count Seventeen, which charged their contemporary with unlawful possession of a firearm modified to shoot more than one round of ammunition without manual reloading by a single function of the trigger, in violation of 18 U.S.C. §§ 922(o), 924(a)(2).

witnesses' testimonies, and we'll present a frame-by-frame vignette of each incident encompassed within the seventeen-count indictment, all of which illuminates the connection between the appellant cousins and the crimes. We kick off our background exposition by giving the lowdown on the offenses, and then we will advance to unravel the winding road of process below.

## A. The Crimes of Conviction

### i. Carjacking Number One - The Toyota Tacoma

On May 20, 2018, around 11:00 p.m., Carlos E. Caez-Delgado ("Delgado"), a then-twenty-four-year-old security guard, was driving his 2016, gray Toyota Tacoma in the Rio Blanco area of the town of Naguabo on his way "to buy, you know, food." Along his path, Delgado encountered a one-lane bridge, which was occupied by a vehicle traveling in the opposite direction. Aptly, Delgado stopped "to wait for the other person to pass." But the vehicle defied his expectation as it approached him "quite fast" with its high beams blazing, and it stopped "practically in front of [him]." A man then exited the vehicle. Delgado, through the headlight's glare, saw the man's "silhouette and . . . [a] firearm." "By then," as he explained, "[the man] was already aiming [the firearm] directly at [him]." Unsure of "what [the man's] intentions [were] and if he[] [was] coming to fire the gun," Delgado put his head down against the wheel and his arms up. "All this happened quite quickly and by then [Delgado] had other people

- 4 -

by [him]," also "pointing their weapons at [him]."  For good reason, he did not "look the[] [men] in the eyes," as he "did not want to give them a motive to feel nervous or try to assault [him] in any manner" -- but Delgado did notice, nevertheless, that the men were likely in their twenties, and that they carried two assault rifles and a handgun between them.  The armed men advanced, the door to the Tacoma was thrown ajar, and Delgado was instructed to get out of the car.  After he exited, the men frisked him for a weapon, and finding none, they gave him a couple of options to avoid being shot -- either "jump off the bridge" or "throw [him]self down in the [roadside] vegetation" and remain still.  Delgado went for the vegetation.  The men then left the area with Delgado's vehicle and with his other personal property trapped within it.

### ii. Carjacking Number Two - The Nissan Infiniti

Later in May 2018, Gilberto José Medina-Cardona ("Medina") and his family, including his wife, his then-fifteen-year-old son, his son's girlfriend, and his then-twenty-or-twenty-one-year-old daughter, were on a family road trip "adventure crossing through Juncos, Canóvanas, . . . Rio Grande, and final[ly,] . . . the rain forest of El Yunque." Seeking to take full advantage of the sights and splendors their voyage had to offer, Medina and his family made use of rural and residential roads on Puerto Rico's northern coast.  On a stretch

of their drive in or near El Yunque, Medina spied "this sight-seeing place" with "beautiful" ocean views and a bridge surrounded by several waterfalls. Spotting this vista, Medina parked the family's 2004, copper-brown Nissan Infiniti nearby. His son and daughter exited the vehicle and trekked toward the waterfalls to pose for photos. Medina, his wife, and his son's girlfriend remained nearer to the family's Infiniti, standing ready on the bridge as photographers to capture the siblings from that auspicious vantage. While his children approached their photoshoot target, Medina, "over [his] shoulder[,] . . . felt a small car" approaching him, "followed by a second car," to wit, "a . . . gray . . . Toyota Tacoma," which "stopped nearby [the family's parked Infiniti]." "And immediately by the left side driver and passenger [side of the Tacoma] . . . [Medina saw] two guys c[o]me out." The two men began "running towards" Medina, his wife, and his son's girlfriend, while "screaming and yelling" at them "[d]on't look at us, don't look at us, get on your knees." As Medina related the story of what transpired on that May 27, 2018 day, "all he c[ould] see [at that point] was these two guys pointing at us with -- one was a large gun and the other one was a handgun with a large magazine." Medina cautioned his wife and his son's girlfriend to follow their assailants' instructions, and he screamed to his son and daughter some ways away by the waterfalls "to stay down." Before Medina knew it, the men were

"at [the family's] back asking for cell phones or all [of the family's] personal belongings, money, jewelry, everything." So, Medina, his wife, and his son's girlfriend "gave them everything." The men then demanded Medina's car keys, which he informed them were in the cupholder of the Infiniti, which was unlocked. "Okay, don't look back, don't look back. Count to one hundred and stay there. Don't look back. Don't look at us," was the men's directive in response. So, gripped in terror and panic, that's what Medina, his wife, and his son's girlfriend did -- as the two men took off with the family's Infiniti and personal effects, including their cameras.

### iii. The Kidnapping Resulting in Death of L.S.M.

Just four days after the second carjacking incident involving the Infiniti, on May 31, 2018, an investigation team from the Puerto Rico Institute of Forensic Science, a Commonwealth of Puerto Rico department, was called to the scene of a "10-7, which refers to a dead person." When the forensics team arrived at the specified locale in the Antigua Central Ward of Canóvanas -- a "rural woody area" blotted by ruins of a "sugar mill, abandoned concrete structures, and . . . an open field of vegetation" -- they encountered a "body with wounds of apparent bullet projectiles" resting there. "In front of the body there was [a] completely burned truck," which appeared "to be that of an Infiniti." Littered around the body, which lay face down in "the

- 7 -

ventral prone position," were forty-six spent bullet casings, nineteen matching the caliber of an AK-47-style rifle and twenty-seven matching that of a pistol. Brain matter was visible. "Wounds. Wounds. Wounds. Wounds," riddled the corpse's head and torso, numbering twenty-six in total. A lack of gunshot residue near the wounds indicated that "the [gunshot] wounds were from a long distance." The observed evidence all plainly indicated foul play to the government, but by whom was the mystery. A pathologist from the Institute of Forensic Science would later identify the decedent as Luis Manuel Saenz-Matias ("L.S.M.").

### iv. Carjacking Number Three - The Nissan Altima[2]

The week following the discovery of L.S.M.'s body and the burned Infiniti nigh, during the early morning of June 3, 2018, Edwin Barreras ("Barreras") was in "Piñones to go surfing" with "two friends of [his], two girls." "[T]he waves were good" that morning, and Barreras foresaw that the cadre "was gonna [have] a nice day out" embracing the ocean's undulations. When the group arrived at the beach in Barreras' gold 2009 Nissan Altima, ever-vigilant Barreras observed near the strand, a "light gray SUV, with two guys with long cameras which were expensive." Not thinking the worst of the fellows when he had not been given reason to, Barreras presumed the men were "just making a video." After

---

[2] Pizarro was not charged in any counts relating to this particular incident in Piñones.

all, as Barreras thought of it, "it's normal in Puerto Rico to see filming crew[s] out and about; it's normal in Puerto Rico especially by the beach."  And "th[ese] w[eren]'t . . . cheap camera[s]," so Barreras "figured [the men] were, you know, cinematograph[ers]."  He nonetheless "drove around twice just to make sure everything was safe," before parking the Nissan.  "Then all three [friends] went down to the beach."

Sometime later (presumably after savoring the surf), Barreras slipped away to stash his surfboard back in his car.  As he did so, one of the men he had noted upon arrival "c[a]me[] up to [him] with an AR15" and stated:  "Hey, this is a carjacking."  While Barreras immediately recognized he was staring down the barrel of a genuine assault rifle, his bold response to the man's declaration was, on his account:  "Ha, ha, ha, is this a joke, man.  Where the camera[s] at?"  A former coastguardsman, Barreras was "thinking to [him]self[,] I can take this guy.  This guy is on drugs, he's nervous, I don't know."  The threat was no joke though.  "Next thing [Barreras] kn[e]w, [he] s[aw] another guy come from the bushes," right behind his car to the passenger's side, and "one of [his] girlfriends[,] she came up and [the guy] hit her with [an] AK47 on her head."  "She fell[,] and that's when [Barreras] got down," and got knocked on the head too.  During this dizzying spell, "one of the girls" was struggling with one of the men over "a real expensive diamond ring, [which] was her mom's,

[and] was worth 20 grand."  The assailant threatened that he would rape her lest she give up the jewel.  She did not yield even so, and her ring remained on her hand; the man remained at enough distance.  The familiar refrain was then screeched:  "Stay down. Don't look at us."  Barreras, perhaps dosed with some reality, feared for his life at that moment, as he had "already looked at them," and because "[t]here's no way, there's no back," from a glance once stolen, especially for someone like Barreras who had been blessed, as he put it, with a "photographic" memory.  But providence spared the frightened victims from quietus that day. The assailants simply snagged Barreras' Nissan Altima and surfboard, plus his rent money, which happened to be in the car in cash, and drove off.

### v. Carjacking Number Four - The Toyota Camry

The very next day, on June 4, 2018, Maria Isabel Martínez-Figueroa ("Martínez"), a then-sixty-year-old homemaker, and her husband were motoring out towards Naguabo in a red burgundy Toyota Camry "to . . . go crab[bing], it was the season."  When they "arrived at the town, at the end[,] the town of Punta Santiago, there [they] saw this vehicle pass [them] by very fast." But they continued.  And then, they "saw a crab and stopped" on the side of the road in an area known as El Amarillo, which is part of Humacao, about three minutes away from Tropical Beach, where Naguabo begins.  After searching unsuccessfully for the crab

though, they moved on.  As they hit the road again, quickly, they "realized there was a car behind [them]."  "And the car was trying to push [them] so that [they] would go [back] to the side of the road.  It was coming from behind and toward the side forcing [them] to stop."  "Well," as Martínez explained, "then [they] had to stop."  And the car which pressed them stopped perpendicular "-- it was like a RAV4 type of car," by Martínez's telling.  "And quickly[,] two people got out, one on the driver's side, the other on the passenger's side."  The driver-side assailant carried a short weapon, and his passenger a long one.  On this occasion, the men did not aim the firearms at the couple directly, "the truth is they . . . maintained them in their hands while they spoke to [the couple] and . . . asked [them] if [they] had weapons."  The answer was no.  And then the men "asked [the couple] to get out of the automobile."  The answer was no again.  At that point, encountering frustration in their criminal mission, one of the "guy[s] that was on the passenger's side shouted out to the SUV that they had gotten out of and said they were gonna have to kill [the couple] 'cause [they] didn't want to get out of the car."  Threat notwithstanding, one crabber still was not persuaded -- "[w]ell, then[,] [Martínez's husband still] didn't want to [get out of the car,] but [she] told him that [they] had to get out because it was better to lose the car than [their] lives."  "[S]o[,] [the couple] got out."  Two of

the men then got in the red Toyota Camry and drove off toward Naguabo.

### vi. Carjacking Number Five - The Kia Sportage

Full pedal to the metal, the car heisting spree continued that day.  In the evening of June 4, 2018, Alicia Roldán-Sánchez ("Roldán") was leaving an after-church meal with friends, "heading home taking a shortcut through the Palma Sola Ward" in the municipality of Canóvanas, when she encountered misfortune.  She was driving a white 2016 Kia Sportage through the ward at the time.  A red car passed by her abruptly and then farther along "cross[ed] over" and stopped.  At first, Roldán was "thinking that the car broke down[,] but a door open[ed] and a young person or a young man got out," and started "heading toward [her] car like[,] crouched down."  Roldán knew in that instant that "something was going on" -- but when she tried to back up, she "had another vehicle behind [her]."  And in a blink, "there's this young man pointing a gun at [her]," saying:  "Get out or I'll shoot you." The gun was "pointed right at [Roldán's] face," so close that, in its barrel (as she put matters quite poetically), she "could see . . . like these half moons."  "Fear[ing] for [her] life," she hurried and "got out of the car because [she] was ordered to get out of the car [then]."  She began to walk toward the woods nearby, as that was an order too.  When she "tried looking behind . . . [one of the men] sa[id] to [her] to keep on walking

or [he'd] shoot [her,] twice," so she kept her eyes forward and kept moving headfirst.  The last image she viewed other than the thickets "was three cars," including her Kia Sportage, taking off in different directions.

### vii. Carjacking Number Six - The BMW X6, and the Kidnapping of Bryant Myers

The ballad of the next day's crimes would reverberate across the island, as infamy orchestrated the mic-drop of our-now appellants' criminal rampage.  The lyric and the beat follow.  On June 5, 2018, a then-twenty-year-old música urbana star, Bryan R. Rohena-Pérez, aka Bryant Myers ("Myers"), was in his grandparents' neighborhood in the Loma Alta area of Carolina, Puerto Rico playing basketball with "quite a few people."  "There at the court . . . were younger guys . . . [and] several [adult] men . . . from the neighborhood," alongside Myers -- and all delighted in the occasion for an evening of wholesome recreation brushing shoulders with one another in the ancient dance of athletics.  Yet hazard had contrary designs, and the once-fond evening took a violent turn just as it began.  "[S]everal people came into the basketball court shouting and it got all -- a mess ensued."  The intruders comprised four men "that were armed" with "long weapons and short weapons," and they were saying:  "Nobody move and look down to the floor."  They homed in on Myers, and they "grabbed [him] by [his] braids and took [him] out of the

basketball court." The men hit him in the head several times in the process, obscuring his vision. Myers' mother, Maria Elena Pérez-Díaz ("Pérez"), had seen what was transpiring from the "balcony at [her] parents' home," where she had been in repose, shoes off, enjoying the view of her son and the neighborhood basketball game just across the road. "[A]ll of a sudden," lacerating the tranquil moment, Pérez observed "on [her] left-hand side this guy passing in front of [her] parents' house . . . carrying on his right side a long weapon . . . in a concealed way." And the man "had his neck upright looking out toward the [c]ourt." Mother's instincts, the "first thing that crossed [Pérez's] mind was to tell [her son] to be careful." But other things happened before she could do so. Pérez "got up and . . . was able to have more visibility toward the court[,] [and she] saw this young man aiming [a long weapon] at [her son]." Panicked, Pérez rushed to the scene, barefoot still, to help her son however she could.

By the time Pérez made it "down the stairs and start[ed] heading toward the road," she saw that "they were bringing [her son Myers] with his head down." "[O]ne guy was in front of him . . . pulling on him by his braids," and "there were three other guys behind them aiming at him." The assemblage was making its way "toward [a] vehicle," a "white van." "And so at that point[,] Pérez approached them and asked them why were they doing

that, to leave him alone, what was it that that wanted[?]" And she "grabbed [her] phone to call the police," but one of the men "took away [her] phone and threw it to the ground and broke it. He broke [her] phone." Pérez then "started begging them to please leave [her] son alone and not to harm him, to please not harm [her] son, and what was it that they wanted[?] [I]f it was money that they wanted to tell [her] what they wanted." "And then the struggle began." Pérez was "grabbing onto [her] son and they were struggling to make him get into the vehicle and then, you know, they were able to get him into the vehicle and [she] kept on holding on and didn't want them to take away [her] son." She was "grabbing onto him by his sneakers" in desperation. "Well, then [one of] the guy[s] . . . started asking where the keys to the BMW" stationed nearby belonging to Myers were, and Pérez "told him, 'I know where the keys are. I know where the keys are but I'm not letting him go alone. He's not leaving without me. I'm going along.'" A response came: "Well, go ahead, take her, take her along too." And the jostling ceased as a "gunshot c[a]me from the area where [one of the men] was standing." The white van's doors shut. And, unlatched from her son, Pérez made her way to the BMW X6 with one of the cohorts.

Now Pérez was in the BMW X6 with one of the men, and Myers was in the white van with the three others. The scene in the X6 looked something like this: Pérez instructs the assailant

how to operate the X6, the X6 takes off with the van, the assailant is driving with a long gun between his legs, "he ha[s] his cell phone and he [is] receiving instructions because he w[ill] repeat what he [is] being told," Pérez begs him not to harm her son, but he keeps replying "[j]ust take it easy, stay calm.  I've been ordered to do this."  Cut to the scene in the van:  "Well, the truth is it [is] abusive."  Myers is in the backseat, and there are men next to and in front of him aiming weapons in his direction. Myers cannot see the weapons, because he is looking down, "but [he] c[an] feel them."  The men who hold his life in the balance are "asking [him] if [he] could go get money and how much money [he] could get."

Eventually, both the X6 and the white van "arrived and parked in front of a gate" near "the entrance of a landfill." "[W]hen they were parking and all that's when the police arrived." The man in the X6 with Pérez then "opened the door and took his weapon and went running."  At a rapid pace, "several shots [then] r[a]ng out."  Then the compadres in the van "stopped focusing on [Myers] so much and focused on the police," and Myers seized the "opportunity . . . to open the [van] door . . . and jump[] out," hurting his knee in the process.  As he spilled out of the van, "[t]wo cops . . . were approaching [him] aiming at [him]," while Myers entreated them:  "Look, I'm a singer.  Look, I'm Bryant Myers.  I'm a singer."  "Then the cops put [him] into the patrol

car."  Pérez, for her part, was taking cover in the X6 while the guns blazed, until "the police arrived and . . . told [her] to take it easy, that [her] son was okay, that he had jumped out of the vehicle."  "And after some minutes they took [her] to where [her] son was."  The men had absconded in the meantime, but law enforcement eventually caught up, as we'll discuss next.

## B. The Proceedings Below

With our mise-en-scène in place, and the crime details spelled out, we move on to discuss the proceedings in the District of Puerto Rico, which held Huertas and Pizarro (along with others) responsible for the above-described events, and which resulted in the imposition of a life sentence plus more on both cousins.

### i. The First Indictment

As dates matter when we review constitutional speedy trial right challenges, we take care in pointing out precisely what happened and when.  See Loud Hawk, 474 U.S. at 305.  The first man to be called to account for the crime spree was Huertas.  On June 20, 2018, Huertas was arrested pursuant to a criminal complaint alleging three offenses -- all deriving from the Bryant Myers incident: carjacking, kidnapping, and brandishing a firearm in furtherance of a crime of violence.  He was taken into custody, and he appeared before a federal magistrate judge the very same

day.[3]  The court "ordered that a member of the [Criminal Justice Act] Panel be appointed to represent [him]," and "ordered [him] detained pending hearings."  Given the detention order, the district court then scheduled a bail hearing for June 28, 2018,[4] at which the "defense counsel stated . . . at that moment they [we]re not requesting bail.  The [district] [c]ourt [thus] ordered . . . [Huertas] detained without bail."

With Huertas in detention, the proceedings next advanced from the complaint toward the charges.  On July 18, 2018, a District of Puerto Rico grand jury returned a three-count indictment pinning Huertas and one of his contemporaries, Joshua Luyando-González ("Luyando"), with the offenses stemming from the carjacking and kidnapping of Bryant Myers.  Huertas was arraigned shortly thereafter on July 24, 2018, wherein he entered a plea of not guilty on all counts.  Luyando was arrested and arraigned a few months later, and he too entered pleas of not guilty on all of the counts charged.  So, the district court attended to its

---

    [3]  At his initial appearance, Huertas "was provided with [a] copy of the complaint and advised as to the charges, maximum penalties applicable[,] and his rights."

    [4]  The district court originally scheduled a combined preliminary and bail hearing for June 28, 2018, but only a bail hearing ultimately took place on that day.  As for the preliminary hearing, Huertas agreed to waive his right to that proceeding several days later on July 10, 2018.

- 18 -

criminal management responsibilities and entered an order scheduling the two men's trial for November 26, 2018.

On the second day of November, the district court set aside Luyando and Huertas' designated trial date -- as Huertas, Luyando, and the government all agreed that additional time was needed to prepare their respective cases. The parties explained to the court that such was necessary because an investigation into Huertas and Luyando's conduct was still ongoing, and because Huertas was likely to be indicted in a parallel case with a death-penalty-eligible offense. Therefore, in lieu of trial, the district court set a status conference for December 13, 2018, which, on the parties' joint motion, got pushed to January 25, 2019. When that conference convened on the 25th, the government informed the district court that its ongoing investigation into Huertas and Luyando had revealed more crimes, and it advised the court that it was consequently seeking a superseding indictment. Considering the metastasis developing in the case, all of the parties then requested that the court schedule a further status conference for after the superseding indictment's filing, and a conference was accordingly set for March 27, 2019.

### ii. The Superseding Indictment

Sure enough, on February 13, 2019, a grand jury returned the superseding indictment as anticipated, and it charged Huertas with four additional offenses: the carjackings of Martínez's

Toyota Camry and Roldán's Kia Sportage, and the brandishing of a firearm in furtherance of those two crimes of violence. Huertas subsequently entered a plea of not guilty as to all the charges on February 19, 2019. After a brief continuance at the government's request, the district court then held a status conference on April 5, 2019. Therein, the parties informed the court that an indictment charging Huertas with the foretold death-penalty-eligible offense had indeed been returned in the parallel-but-separate proceeding previously noted, and they apprised the court that in consequence they had "agree[d] that 60 additional days [we]re needed to receive all discovery, [to] decide if the cases w[ould] be consolidated, and [to] explore negotiations, while the other [parallel] case against Huertas-Mercado progresse[d]." The government told the court in addition that a plea offer had been tendered to Luyando -- which remained outstanding -- and that "it [was] likely that no offer w[ould] be tendered" to Huertas. Hence, the district court set a further status conference for May 30, 2018, at which point the parties again "agree[d] that additional time [was] needed to receive all discovery and engage in negotiations . . . . A further status conference was [accordingly] requested for mid-August."

On August 12, 2019, that further status conference took place. There, the government told the court that Luyando was still in plea negotiations. Concerning Huertas, the government said

- 20 -

that it still did not plan on tendering him a plea offer. Moreover, the government cautioned that its investigation into both Huertas' and Luyando's conduct remained ongoing, and it advised that a second superseding indictment charging the men with additional crimes could be filed by the end of the following month. The district court set trial for November 12, 2019, nonetheless.

### iii. The Second Superseding Indictment

As predicted, a grand jury returned the second superseding indictment the following month on September 25, 2019, which charged Huertas with two additional counts related to the beachfront carjacking of Barreras' Nissan Altima. Huertas entered a plea of not guilty on the newly charged counts on October 8, 2019. Huertas and Luyando's November 12th trial date remained in place, and as it crept nearer, Luyando, on October 30, 2019, moved to change his plea pursuant to an agreement with the government. Steadfast Huertas though, a few days later, informed the court that he intended to exercise his right to go to trial. "Because the Court w[ould] not be available on November 14-15, [however,] trial was continued. Counsel [for Huertas and the government] were consulted as to their schedule[s] and the availability of witnesses, and agreed on a date during the first week of February. Jury Trial for Huertas was continued for 2/3/2020 at 09:00 AM in Courtroom 2 before Judge Francisco A. Besosa."

- 21 -

On January 17, 2020, as the February 3rd adjusted trial date loomed, Luyando's counsel, still in pursuit of a final agreement with the government, filed a further status report, which threw another wrench in the wheels of justice. Counsel's report advised the district court that Luyando "wished to cooperate with the United States," and it explained that "should [Luyando's willingness to cooperate] result in a formal cooperation agreement, the United States w[ould] supersede the instant indictment with additional defendants[,] which would delay the currently scheduled February 3 trial date." In view of that information, the district court set aside the February 3rd trial date, opting to hold a pretrial conference in its place. During that scheduled conference on the 3rd, the government informed the court that it would be seeking a third superseding indictment, with additional counts and codefendants, by February 11, 2020. Thereupon, the district court determined that a "new schedule [would] be established once the superseding indictment [had] been filed and the defendants [had] been arraigned."

#### iv. The Third Superseding Indictment

Now, we pause for some quick math on time's passage so far, keeping in mind that Huertas is before us asserting his constitutional right to a speedy trial (something he never made a peep about below). Between the first indictment on July 18, 2018, and the date when the grand jury returned the third superseding

- 22 -

indictment as predicted on February 11, 2020 -- adding cousin Pizzaro and three other men as codefendants, and charging each of the men with their own personal mix of offenses drawing from the suite of earlier-discussed crimes, now including all of the carjackings heretofore told, along with the brutal killing of L.S.M. -- around nineteen months had come and gone. And the counts charged had increased correspondingly, now comprising seventeen.[5] And, as the ides of March 2020 neared, as fate would have it, COVID-19 was skulking just around the corner.

All the same, within three weeks of the third superseding indictment's return, most of the newly charged men -- with the exception of Pizarro and Wilkin Michael Cepeda-Colon ("Cepeda") -- had been arraigned.[6] While the parties and the court

---

[5] To refresh, Counts One, Two, and Three charged carjacking, 18 U.S.C. §§ 2119(1), 2, kidnapping, 18 U.S.C. §§ 1201(a)(1), 2, and discharge of a firearm in furtherance of those crimes of violence against Bryant Myers, 18 U.S.C. §§ 924(c)(1)(A)(ii)-(iii), 2; Counts Four through Thirteen charged the remainder of the carjackings and the brandishing of firearms in furtherance of those crimes of violence; Counts Fourteen, Fifteen, and Sixteen charged the kidnapping resulting in death of L.S.M., 18 U.S.C. §§ 1201(a)(1), 2, the discharge of a firearm in furtherance of that crime of violence, 18 U.S.C. §§ 924(c)(1)(A)(iii), 2, and the discharge of a firearm in furtherance of that crime of violence causing murder, 18 U.S.C. §§ 924(j)(1), 2. As we previously noted, supra note 1, neither Huertas nor Pizarro was charged in Count Seventeen, which charged their cohort with unlawful possession of a firearm modified to shoot more than one round of ammunition without manual reloading by a single function of the trigger.

[6] Cepeda had had his arraignment continued twice, first due to a scheduling conflict, and next, on March 11, 2020, because of a chicken pox outbreak at the Bayamón Correctional Complex where he was being held, which resulted in his unit, B-9, being placed

- 23 -

worked diligently to schedule the last two men's arraignments lickety-split, lamentably, the COVID-19 virus vexed even the best-laid plans during this period in world history.  In response to this universal crisis -- one imperiling the health of all -- on March 13, 2020, the then Chief Judge of Puerto Rico's federal district court, issued an order continuing all trials "scheduled to begin between March 16, 2020 and May 29, 2020" because "of the outbreak."  Another order continuing all "civil and criminal non-jury trials, hearings, and conferences scheduled before district and magistrate judges" followed two days later, and an order continuing deadlines followed soon on that order's heels. In-person proceedings, including jury trials, were ultimately continued until November 6, 2020, the time restrictions were relaxed, until they were lifted altogether on December 19, 2022.

Yet the pretrial process soldiered on.[7]  On May 18, 2020, the government, in consultation with the defendants, filed a status report with the district court.  In the report, the government emphasized (among other things) that three of the codefendants,

_____

in quarantine until the 17th.  Meanwhile, Pizarro was being held in custody in a facility in Philadelphia on an unrelated charge, as the government "filed the appropriate paperwork to have [him] transferred to [Puerto Rico]" for his arraignment there.

[7] Cepeda's arraignment eventually took place via video teleconference on May 7, 2020.  Pizarro, for his part, would not be arraigned until March 1, 2021, but neither the parties nor the court lollygagged while his arraignment lingered.

Huertas, Pizarro, and Luyando (who still had not reached a plea agreement with the government at this time), had been rendered eligible for the death penalty in the instant matter on account of their involvement in the death of L.S.M. On that solemn score, the government told the court that "initial discovery ha[d] been provided, learned counsel[8] ha[d] been appointed, and the case ha[d] been submitted to the Capital Crimes Unit for death penalty review."[9] The government concluded by saying "the parties need[ed] additional time for death penalty determinations to be made for the death-penalty eligible defendants" and "to review discovery and discuss plea offers" with the others. In turn, the district court ordered Huertas, Pizarro, and Luyando to file, by August 10, 2020, a joint informative motion "indicating the status of investigations being conducted by learned counsel [relative to the death penalty review process] and the time needed to conclude them."

---

[8] See United States v. Pesante-Lopez, 582 F. Supp. 2d 186, 187 (D.P.R. 2008) (explaining that "Congress codified a federal capital defendant's right to representation by two attorneys, one of whom must be 'learned in the law applicable to capital cases.'" (quoting 18 U.S.C. § 3005)).

[9] Concerning Cepeda and the other two codefendants, Kevin Villegas-Carrasco ("Villegas") and Roberto Meléndez-Hiraldo ("Meléndez"), the government explained that "initial discovery [had] been provided and the parties [were] in plea negotiations." They were given a deadline date, like the others, of August 10, 2020 to file any pretrial or change of plea motions.

The August 10th deadline was later pushed to September 10, 2020 by the district court.[10] In anticipation of the appointed deadline, on June 25th, the government notified the district court that it would not seek the death penalty as to Pizarro and Luyando on the offenses underlying this case (leaving Huertas by himself on the death penalty hook). The government also filed a status report with the district court, in consultation with the defendants, on September 10th. The report apprised the court that all of the charged men, except Pizarro, who was still awaiting his arraignment, and Huertas, who was still mired in death penalty review, were in active plea negotiations. As such, the parties requested a sixty-day extension to change their pleas or to file informative motions, which the court granted.

Sixty days later, in November 2020, plea negotiations still had not concluded. In addition, the government had informed the district court that Luyando and Huertas could face new death-penalty-eligible charges soon (though such charges never came to be). The district court in response granted the parties another extension to file their change of plea or informative motions until January 15, 2021. That deadline passed too without

_____

[10] In the lead up to September 10th, Pizarro filed several motions concerning the death penalty process, including a motion requesting a mitigation expert, a motion requesting an interpreter, a motion requesting an investigator, and a motion requesting a paralegal to assist appointed learned counsel's death penalty review -- all of which were granted.

any motion, so, on January 17th, the district court issued an order stating that the parties had "failed to comply with" its deadline and requiring the parties to comply with its prior order by February 5, 2021.

Before February 5th arrived, Huertas filed an informative motion telling the court that "[d]ue to the Covid-19 pandemic, in person case preparation, including mitigation investigation, [had been] severely impeded." Because DOJ protocols contemplate a mitigation submission by the defense in a case authorized as a capital prosecution,[11] and because COVID-19 had apparently impeded that submission's preparation as to Huertas, the district court, considering his motion, continued Huertas' deadline to move for a change of plea or to notify the court that he would go to trial.[12]

---

[11] Huertas explained in his informative motion that DOJ protocols provide a limited carve out empowering the government under certain circumstances "with the ability to . . . [to seek] a fast-track disposition" of the death penalty review process, which "does not require a mitigation submission by the defense," but he did not suggest that the government should seek such a disposition in this case.

[12] Luyando notified the court for his share that although he had not reached a plea agreement with the government yet, he "[did] not anticipate going to trial in any of the cases in which he [had] been or [would] be charged." And Pizarro failed to apprise the court of any new developments whatsoever, though he was eventually arraigned on March 1, 2021, before the next scheduled conference. As for the other three criminal cohorts: Cepeda moved to change his plea on January 28, 2021, and he pled guilty on February 21, 2021. Villegas moved to change his plea on February 5, 2021, and he pled guilty pursuant to an agreement with the government on March 15, 2021. And Meléndez, who just barely

How Huertas, Pizarro, and Luyando would proceed was thus left to be determined come March 2021, when a further status conference was held.  At that conference, the government informed the court that death penalty review for Huertas was still ongoing, that Luyando had been targeted for a separate murder investigation, and that the government was hoping to reach an agreement with Pizarro.  A "[f]ollow [u]p [d]eadline" was accordingly set for May 14, 2021.  In advance of the appointed date, the government filed a motion notifying the district court that it would not seek the death penalty against Huertas nor Luyando in any of the cases pending against them.  With that, the death penalty review process met its denouement.

Post conclusion of the death penalty review process, the government tendered a plea offer to Huertas after all.  Once Huertas, Pizarro, and Luyando's criminal contemporaries had reached plea agreements with the government and been sentenced, the district court set a status conference for the trio for January 3, 2022, which was later pushed to January 10th on Huertas' motion.  On the 10th, Huertas, Pizarro, and Luyando informed the court that they remained in plea negotiations.  Luyando, for his

_____

missed the February 5th deadline, notified the court soon after that date that he had entered into an agreement with the government in a separate case, under which the government would dismiss at sentencing the charges against him in the criminal case underlying this appeal.

- 28 -

part, told the court that he intended to plead guilty pursuant to an agreement with the government in short order. But Huertas and Pizzaro apparently had not yet discussed their plea offers with counsel due to COVID-19 related complications, which purportedly prevented them from doing so. The court thus set a deadline of January 28, 2022 for change of plea motions. All three defendants missed that deadline too. That said, by February 9, 2022, Huertas had informed the court that he had rejected the government's plea offer and would go to trial. Luyando had moved to change his plea to guilty, pursuant to an agreement with the government. Per contra, Pizarro, still silent, had given no indications of his intentions.

The district court accordingly held a conference concerning just Huertas and Pizarro on February 22, 2022. Pizarro's counsel there again indicated that COVID-19 was complicating communications between her and him, so a status conference was reset for March 10th. At that penultimate status conference, Pizarro's counsel told the court that Pizarro was still not fully understanding the plea offer but would likely go to trial. The district court told Pizarro and Huertas to be prepared for trial by May. The last pretrial conference was held on May 9, 2022. Pizarro confirmed then that he would go to trial with his cousin, Huertas. As such, the court set the trial date for September 6, 2022. And the trial began, as scheduled, on that

day, some fifty-one months after the first indictment charging Huertas.

### v. The Trial

After each party gave its opening statement, the prosecution started calling witnesses. We will not repeat the testimonial facts we have already outlined in our background section; we will acquaint the reader with the hitherto unmentioned evidence needed to evaluate the appellate claims before us.

The government kicked off its case with the testimony of FBI task force officer Jonathan Rosado-Rodriguez ("Rosado"), a fifteen-year law enforcement veteran. Rosado explained to the jury that in summer 2018, he began investigating "a series of carjackings and kidnappings." In that effort, Rosado stated that he "interview[ed] an individual known as Jairo Huertas-Mercado," on the 19th of June. Rosado testified that during the interview, after Mirandizing Huertas, Huertas admitted several points: that he had targeted and kidnapped Bryant Myers after four days of planning because Myers "had [supposedly] made some comments in a song" against a group, that Huertas had, sometime earlier, carjacked "a lady" to acquire the Kia Sportage which was used to transport Myers during the kidnapping, and that he had carjacked a Toyota Camry "in the town of Naguabo, in the area of the beach," sometime before that, which he later "sold . . . in a housing project" nearby. A second Mirandized interview of Huertas was

conducted by Rosado the following day at "[t]he federal building located on Chardon Avenue in Hato Rey," where Huertas admitted to an additional offense: the carjacking of a Nissan Altima from "a male, and two females," in the Piñones area. As for that hot wheel, Rosado explained that Huertas had confessed that it was sold "at the drug point" in "the Los Mirtos housing project in Carolina."

The next day of trial, the testimony of the carjacking victims, excepting Bryant Myers, was presented, as well as testimony from certain forensics team members who had investigated the brutal scene where L.S.M.'s body rested in the La Central area. In that day's testimony, Barreras, the surfer coastguardsman jacked for his Altima, identified Huertas in open court. And Pérez, Bryant Myers' mother, testified too about identifying Huertas through photographs nine days after the kidnapping and carjacking.

On the third day of trial, Villegas, Huertas and Pizzaro's comrade turned cooperating witness, delivered more damning evidence pinning the charges relative to the Bryant Myers incident on the cousins, and further illuminating Pizzaro's role in all of this violence which we now review.[13] Some brief

---

[13] A prosecution expert witness, Guillermo González, also testified on this day of trial about the "international nexus of vehicles possessed in Puerto Rico," as did "an expert in ballistic and firearms," Israel Sánchez-Amaro, who testified about the

background on Villegas. Villegas told the jury that, after living for some time in the continental United States, he had "arrived in Puerto Rico to be in the underworld[,] because [he] had [a] friend in the underworld who needed or wanted to control the Los Mirtos housing projects, so [he] came to Puerto Rico to help him." On that takeover mission is how Villegas met Pizarro, Huertas, and Luyando, during "meetings" "at the [nearby] Lagos de Blasina housing project."

After telling the jury the tale of his life in much more detail than is necessary here, Villegas testified how he "participate[d] in the kidnapping and carjacking of Bryant Myers and his mom," with "Erick [Pizarro-]Mercado," who he identified in open court "here to [his] right next to his defense with a red shirt with buttons," "Jairo Huertas-Mercado[,] sitting there next to his defense with the black sleeved shirt with buttons[,]" and "Joshua Luyando." Villegas told the jury then how Huertas, aka "Cavito," Pizarro, aka "Chimi," Luyando, aka "Jumanji," and their cohort Cepeda (who participated in the discussion over the phone, and who also happens to be a cousin of the appellants), had hatched a plan to "go talk to" Bryant Myers after receiving "knowledge that Bryant Myers was in the Las Lomas Ward neighborhood where his

firearm and ballistic evidence gathered at the scene of L.S.M.'s death, reasoning that it was consistent with the weapons which testimony showed that the appellants were using.

mother lived." Villegas explained that the men's reason for the engagement was because "according to the information they had, Bryant Myers[] had paid for the death of one of their cousins known as Corroro." Villegas told the jury how in pursuit of the luminary target, the men all "got in [an] SUV, a white Sportage . . . [and drove to] this place where Bryant Myers was known to be," and how "[he] was carrying a Glock automatic 9 by 19 automatic. Erick [Pizarro-]Mercado to [his] right here with the red shirt with buttons he was carrying an AK47. Jairo Huertas-Mercado[,] to [his] right here wearing the black shirt with buttons[,] he was carrying an AK47 known as The Punisher. [And] Joshua Luyando was carrying an AR15." Villegas said that all the guns were loaded, "[y]es, loaded." He explained how, after arriving "at the basketball court in Lomas" where Bryant Myers was recreating with neighborhood friends and acquaintances, Pizarro and Luyando "went ahead and grabbed [Myers] by force," "hit him in the head with [a] pistol, as [they] say in the underworld," and "put him in the SUV." He reported how, when people gathered around to try to stop them, "Joshua Luyando went ahead and fired a shot in the air" to disperse "all the people," and how Pérez during all this time, "was by [the] SUV crying, nervous, just like any mother." And he recounted how he "communicated to [Pérez]" around this point in the action that "[n]othing[] [was] gonna happen to [her son]," with the ominous addendum: "but the thing is that your son is mixing the streets

with music." Villegas elaborated on Pérez's position at that time, somewhat enigmatically, saying that the men "wanted to put her in the [Sportage] so that she would be safe," but because "she didn't fit," Huertas "got out . . . and got into Bryant Myers' BMW and Bryant Myers' mom got in with him," leaving Pizarro, himself, and Luyando in the Sportage with Myers. He narrated what followed, how after driving the Sportage and "park[ing] toward the exit of [a] landfill," the "Carolina municipal police [arrived] . . . [and Huertas] got out [of the X6] and jumped over the fence and ran into the -- ran away into the vegetation of what divides Carolina from Canóvanas," and the "police at that point fired several shots," and Myers "opened the door and jumped out" of the Sportage, and the men in the Sportage "took off [driving] at high-speed" -- and "everyone was able to escape." His telling revealed too that the SUV-of-escape was burned sometime later.

On the fourth day of trial, the final witness relevant to the instant appeal, Luyando, another cohort turned cooperator, took the stand; and his testimony would extend into the next day.[14] Luyando put much flesh on the bones of the evidence outlined so far. He explained to the jury how, with Huertas and Pizarro, who he identified in open court, he had "participated . . . in

---

[14] This day of trial also included testimony from Bryant Myers, which we have already rehearsed in our recital of the pertinent background facts.

- 34 -

carjackings" in order "to commit robberies, murder[,] and to move around." Relative to the carjackings, he explained how he, Huertas, and Pizarro had stolen "by intimidation and . . . force" a Tacoma, an Infiniti, an Altima, a Camry, a Sportage, and an X6, providing testimony which aligned with that of Villegas and the victims. Relative to robbery and murder, Luyando explained that the men had engaged in such criminal conduct because they had "enemies [and] rivals" in the "[d]rug [game] . . . [who] wanted to take over the places where [they] spent [their] time," and because he, Pizarro, and Huertas had a get-them-before-they-get-us attitude. On that more gruesome latter strand, Luyando provided a window into the kidnapping resulting in the death of L.S.M. So, borrowing the words the prosecution used, "[l]et's talk about that murder."

As Luyando narrated the macabre tale, on May 31, 2018, "[he] was with Jairo [Huertas], Erick [Pizarro], and [a man called] Jico[,] and [they] were coming down from Carolina toward Naguabo[,] and [they] were going to drop Jico off at his house. And[,] as [they] were passing by the Villas Del Río housing project[,] [they] came up with the idea while entering into the housing project of holding up the [local] drug dealer." With that proposed dreadful deed in mind, the men proceeded, first dropping off Jico "at his house [be]cause he wasn't gonna do any of that with [them]," and then circling back to "enter[] into the Villas Del Río housing

project and . . . do what [they] thought [they] could do." Luyando espied and "identified the [drug] seller," L.S.M., who he had known since childhood, Huertas then "went walking to him and asked him for weed . . . [with a] firearm hidden in his back, and when he identified him[,] he aimed it at him." Huertas "told him not to move. Then [Pizarro] followed him and also aimed at him with the rifle." Luyando stayed in the car observing. Pizarro and Huertas then "took the drug dealer's money and drugs and [Luyando] open[ed] the [car] door and told them to bring him, and they put him in the vehicle that all three of [the men] were in." The men then drove L.S.M. to what Luyando described as a "landfill" in the La Central area, with guns raised at their victim along the way. On their route, Huertas, Pizarro, and Luyando "were telling the victim to talk [be]cause he was too quiet, not to be afraid. And [they] were asking him if he knew of another person who was of a higher rank than him, you know . . . somebody more important, somebody who was like [them] after [them] doing the same thing to [them]." When the men were not getting an answer, they "ask[ed] [L.S.M.] if he wanted to have his crew wearing a shirt with his photograph on it[,] or if he preferred to have somebody else," which "meant to tell him at that point . . . if he wanted to give up somebody else [to die] . . . [he] could pick somebody else instead of him." When L.S.M. "didn't say anything," Luyando, Pizarro, and Huertas, after consulting with another member of their crew called "Gongo" over

- 36 -

the phone, "knew what [they] had to do. [Their] understanding [was] that [they were] meant . . . to kill [L.S.M.]" So, the men "entered into La Central to an old factory and when [Luyando] parked close to the Infiniti that [the men] had [earlier] burned[,] [Huertas] got out and got [L.S.M.] out after." And then Pizarro "also got out." And Pizarro "aimed at the victim" with an AK47 rifle, to wit, "[t]he Punisher," as the victim "had his back to him," and shot. Huertas "also started shooting at him." In this murderous frenzy, Luyando "took the firearm away from [Huertas] and also started shooting at [L.S.M.]" And then the men "got into the[ir] vehicle and left."

After the conclusion of Luyando's testimony on the fifth day of trial, the prosecution rested. Both Pizarro and Huertas then moved for acquittal on all counts charged under Federal Rule of Criminal Procedure 29, raising many of the same sufficiency arguments which they now raise to us. See Fed. R. Crim. P. 29(a) ("After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."). The court denied the motions. The court then recessed for the evening and proceeded the next morning with jury instructions and closing arguments, as the defense did not call any witnesses or introduce any additional evidence of its own. Jury deliberations began on

September 13, 2022, at 2:34 p.m., and, after mulling over their decision until the next afternoon, on the seventh day of trial, the jury returned a verdict of guilty as to all offenses Pizarro and Huertas were charged with in the third superseding indictment underlying this appeal.

### vi. The Sentencings

### 1. Huertas' Sentencing

Huertas' sentencing took place several months later on February 10, 2023. At the hearing's kickoff, the district court, on the government's motion, "dismissed on double jeopardy grounds" Count Fifteen of the indictment -- which charged Huertas with discharge of a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c) -- a lesser included offense relative to Count Sixteen, discharge of a firearm in furtherance of a crime of violence causing murder, 18 U.S.C. § 924(j). Huertas did not utter a word at the sentencing or during trial about any double jeopardy implications of Count Fifteen, nor did he object to that Count's dismissal.

After the lesser included Count Fifteen got dismissed, the government requested a life sentence plus 45 years for Huertas on the remaining offenses. The defense, for its part, offered this statement: "I mean, there is really no sentencing recommendation, Your Honor." Thus, after conducting the requisite Guidelines mathematics, and after considering the apposite

- 38 -

considerations, the district court sentenced Huertas to a life term of imprisonment plus 660 months, with a term of supervised release to follow if ever released from incarceration. Huertas did not make any objections to the sentence imposed, nor does he raise any claims relative to his sentence on appeal.

### ii. Pizarro's Sentencing

Pizarro's sentencing hearing also took place on February 10, 2023.[15] At the hearing, Pizarro's counsel recommended a sentence "in the range of 40 or 50 years," while the government recommended a sentence "of life plus 38 years consecutive." In his argument for a sentence less than life, Pizarro's counsel offered this laconic pitch: "The Court is aware that he has two children and wants to help with family when he comes out, Your Honor. That's what we have to say." The government, for its part, emphasized the serious nature and the numerosity of Pizarro's offenses. The court then attended to its task and sentenced Pizarro to a "total imprisonment term of life imprisonment plus 456 months." A term of supervised release was additionally imposed upon Pizarro "if ever released from confinement."[16] There was no objection.

---

[15] Count Fifteen was dismissed as to Pizarro during his sentencing.

[16] We will provide more details outlining Pizarro's sentencing hearing later when we address his sentencing arguments before us.

Sentenced to life in prison plus, Huertas and Pizarro now voice their grievances to us. With the benefit of our presentation of the facts, we can deal with the arguments forthrightly, starting with Huertas' speedy trial claim.

## A. Huertas' Constitutional Speedy Trial Claim

The Sixth Amendment provides that all criminal defendants "shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "If the government violates this constitutional right, [then] the criminal charges must be dismissed." United States v. Dowdell, 595 F.3d 50, 60 (1st Cir. 2010). Huertas says that the government here did just that,[17] and

---

[17] In addition to his well-developed (on appeal) argument that the government violated his Sixth Amendment speedy trial right, Huertas argues with thin analysis that "the limitations placed upon the Federal Government by the Due Process Clause of the Fifth and Fourteenth Amendment . . . were passed in the case at bar that denied Huertas a speedy trial for a period of fifty-one (51) months in violation of these constitutional protections." True, our circuit has acknowledged in past cases that "pretrial detention . . . resulting [in a] length of detention [which] is substantial enough to constitute 'punishment' without trial . . . [may] violat[e] . . . the due process clause of the fifth amendment," United States v. Zannino, 798 F.2d 544, 547 (1st Cir. 1986), as Huertas argues in patches. We pointed to some factors which may guide the analysis whether due process has been so run afoul in Zannino. Id. And the Supreme Court has indeed acknowledged that "the Due Process Clause of the Fifth Amendment would require dismissal of [an] indictment if it were shown at trial that the pre-indictment delay in th[e] case caused substantial prejudice to [a defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused," United States v. Marion, 404 U.S. 307, 324 (1971), as Huertas argues, without support, as we will

he duly mounts a total attack on the verdict below.[18]  To support his speedy-trial blitz, Huertas asserts that the pretrial period of fifty-one months which elapsed between the first indictment -- which charged him and Luyando with three counts relative to the Bryant Myers incident -- and the trial -- which held him and Pizarro to account for those three counts and fourteen more -- was gratuitously lengthy because of the government's impropriety and in violation of his constitutional right.  As earlier noted, not once did Huertas raise his speedy trial grievances to the district court.  Thus, he concedes that this court should review his constitutional claim for plain error, and we proceed in accordance with that appellant-inimical-standard understanding.  See United States v. Perez-Cubertier, 958 F.3d 81,

---

later show, occurred here.  With all that said, because Huertas fails to develop an argument based in the relevant caselaw explaining how his due process rights were violated below, beyond his flat statement that they were, we find this alternative line of constitutional argumentation waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

[18] We note for the reader's benefit that Huertas brings no developed argument before us relative to his statutory right to a speedy trial pursuant to the Speedy Trial Act, 18 U.S.C. § 3161 et seq. (1985), nor did he move for dismissal of his case under the Act during the district court proceedings, meaning any statutory arguments he could have raised here against his conviction are flatly waived, as Huertas concedes in his opening brief.  See id. § 3162(a)(2) (providing that "[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal" under the Act).

90 (1st Cir. 2020) (reviewing constitutional speedy trial arguments raised for the first time on appeal for plain error); see also United States v. Cahill, 85 F.4th 616, 621 (1st Cir. 2023) (explaining that "[t]he [appellant's] burden [to succeed] under the plain error standard is a heavy one" and that "[t]he [appellant] must prove '(1) an error, (2) that is clear or obvious, (3) which affects his substantial rights . . . and which (4) seriously impugns the fairness, integrity, or public reputation of the proceeding'" (first quoting United States v. Ramirez-Benitez, 292 F.3d 22, 27 (1st Cir. 2002); then quoting United States v. Correa-Osorio, 784 F.3d 11, 17-18 (1st Cir. 2015))). Standard of review in situ, we move on to evaluate Huertas' constitutional claim.

We begin our plain-error analysis ferreting out potential obvious errors in the record. See Cahill, 85 F.4th at 621. The error alleged by Huertas is that the government plainly contravened his constitutional speedy trial right, so that is where our dig is focused. But sit tight reader, a little background on the Sixth Amendment right will prove helpful before we begin our excavation.

The Supreme Court has explained that the speedy trial right "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation[,] and to limit the possibilities

that long delay will impair the ability of an accused to defend himself." United States v. Ewell, 383 U.S. 116, 120 (1966). While the orbit of the safeguard's aegis is undoubtedly expansive, "[t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." Beavers v. Haubert, 198 U.S. 77, 87 (1905). The necessarily relative nature of the speedy trial right is why, as the Court has eloquently expressed, "the speedy trial right is so slippery." Barker v. Wingo, 407 U.S. 514, 522 (1972).

In this constitutional vein, the Supreme Court has limned a quadripartite balancing test which courts are to apply to determine if the slippery trial right has been abridged. See id. at 530-33. The formula calls for an assessment of (1) whether the delay before trial was unusually long; (2) whether the government or the defendant is more to blame for that delay; (3) whether the defendant timely asserted his right to a speedy trial; and (4) whether he suffered prejudice as a result of the delay. See Doggett v. United States, 505 U.S. 647, 651 (1992) (citing Barker, 407 U.S. at 530). Commonly referred to as the Barker factors, "[n]one of [the identified factors] is either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be

relevant."  United States v. Henson, 945 F.2d 430, 437 (1st Cir.

1991) (citation modified).

### i. Length of Delay[19]

The first Barker factor, the length of delay, is "a

double enquiry."  Doggett, 505 U.S. at 651.  The criterion serves

both as "a triggering mechanism for the rest of the [speedy trial]

---

[19] Huertas and the government agree as a general matter that the first speedy trial factor concerns the length of delay between Huertas' indictment and the date of his trial.  See United States v. Reyes, 24 F.4th 1, 29 (1st Cir. 2022).  That said, Huertas and the government clash over whether the "the speedy trial clock ticks anew for [the] offenses that [were] added in superseding indictments" in this case (the government's position) or, on the other hand, whether the clock runs from the moment of the first indictment for all counts charged (Huertas' position).

This court has previously opined on this speedy trial topic "that the start-date question is not subject to per se rules -- e.g., that the date of the original indictment is always the start date, or that it is never the start date when a new indictment adds charges."  See United States v. Handa, 892 F.3d 95, 106 (1st Cir. 2018) (discussing the when-does-the-clock-start issue).  Rather, we have explained that "the Sixth Amendment inquiry requires careful consideration of all the factual circumstances presented."  Id.

Under circumstances such as "where (1) the additional charge and the charge for which the defendant was previously accused are based on the same act or transaction, or are connected with or constitute parts of the common scheme or plan previously charged, and (2) the government could have, with diligence, brought the additional charge at the time of the prior accusation," we have held that "the bringing of the additional charge does not reset the Sixth Amendment speedy trial clock to the date of a superseding indictment."  Id.  Huertas argues that such circumstances are present in this case, and the government says the opposite, as expected.  Because the outcome of this appeal does not turn on when we start the clock, we will assume without deciding that Huertas is correct, and we will measure the length of delay for all counts charged from the date of the first indictment.

analysis, and a factor in that analysis." United States v. Carpenter, 781 F.3d 599, 609 (1st Cir. 2015). Relative to the first factor's role as a trigger, we have explained that in order "[t]o invoke the Sixth Amendment speedy trial inquiry, a defendant must allege that the time between accusation -- whether by arrest or indictment -- and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." Handa, 892 F.3d at 101 (citation modified). Courts have observed that a delay approaching one year is presumptively prejudicial, and that crossing that threshold triggers the need for a judicial examination in which a court must proceed to weigh the length of delay against the other Barker factors. Id. at 102; see Doggett, 505 U.S. at 656 (explaining that "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria").

Huertas and the government agree here that the fifty-one-month span which elapsed between when he was first indicted and when the trial commenced, which is the period relevant to our inquiry, exceeds "the one-year point at which pretrial delay is generally considered presumptively prejudicial." United States v. Casas, 425 F.3d 23, 33 (1st Cir. 2005). And Huertas and the government agree that, in addition to triggering the speedy trial inquiry, the fifty-one-month delay weighs against the government in our balancing of the Barker factors. See Rashad v. Walsh, 300

- 45 -

F.3d 27, 34 (1st Cir. 2002) (explaining that "as the length of the delay increases, its relative importance also increases").  Seeing no reason to unsettle the parties' settled course, we find that the length of delay weighs in favor of Huertas.

### ii. Reasons for Delay

The second factor considering the reasons for delay is the "focal inquiry" of the Barker test.  See United States v. Lara, 970 F.3d 68, 82 (1st Cir. 2020).  Huertas argues in essence that the reasons for delay below were primarily attributable to the government, and moreover that the government intentionally orchestrated the delay in bad faith -- and he says that that means this central criterion weighs heavily in his favor.  See Doggett, 505 U.S. at 656 ("Barker stressed that official bad faith in causing delay will be weighed heavily against the government.").  The government argues that the reasons for delay were all neutral or attributable to Huertas.  For instance, in its efforts to throw the blame for the pretrial delay back at Huertas, the government points to Huertas' failure to request severances of counts or defendants, to the requests for continuances submitted by his codefendants in which he joined (and thus made his own), and to the delay which Huertas, himself, purportedly caused during the death penalty review process.  The government says that this focal feature therefore does not favor Huertas.  See, e.g., Lara, 970 F.3d at 82 ("Thus, because the delay is 'largely due to the needs

- 46 -

of codefendants, rather than any slothfulness on the government's part,' this second factor points against finding a speedy trial violation." (quoting United States v. Vega Molina, 407 F.3d 511, 533 (1st Cir. 2005))).  Because our appraisal of the reasons for delay falls somewhere in the middle of the parties' in terms of who was at fault for reasons we'll shortly explain, we find that the crucial second factor in our inquiry fails to meaningfully tip the scale one way or the other here.

We start with Huertas' arguments in his labors to tilt the scale.  Huertas points to three primary, government-provoked reasons he contends caused the fifty-one-month delay, and we will discuss each reason in turn.[20]

First, Huertas points to the "increasing number of superseding indictments," and argues, without citation to any relevant authority, that the government's decision to file three of them in this case should be weighed against the government in our speedy trial calculus.  In response, the government points aptly to this court's prior expression that "superseding indictments setting forth new charges or adding new defendants are familiar fare," United States v. Flemmi, 245 F.3d 24, 28 (1st Cir.

_____

[20] Huertas observes that the COVID-19 pandemic played a major role in the delay ad rem, but he does not "blame the government for that."  See, e.g., United States v. Vargas, 97 F.4th 1277, 1291 (11th Cir. 2024) ("At the most basic level, everything slowed down during the COVID-19 pandemic.").

2001), which, together with our prior pronouncement that we will not "find bad faith from a record barren of indications that any [bad faith] in fact existed," United States v. Colombo, 852 F.2d 19, 25 (1st Cir. 1988), means that Huertas, who cites to no record evidence to support his argument, cannot prove any misconduct by the government in seeking the follow-up indictments. See United States v. Worthy, 772 F.3d 42, 49 n.10 (1st Cir. 2014) (rejecting a speedy trial "argu[ment] on appeal that the government's strategy of bringing successive indictments itself betrays a dilatory and venal purpose," when, as here, "all the indictments in th[e] case added either additional codefendants or new charges"); see also Rashad, 300 F.3d at 34 (explaining that "to the extent that valid reasons cause delay," it "does not count against the [government] at all"). Because our review of the record confirms the government's assertion that Huertas highlights no evidence suggesting governmental misconduct in its pursuit of additional superseding indictments, we decline to weigh the seeking of the three superseding indictments against it.[21]

---

[21] Huertas propounded on this point at oral argument, saying that the government was plainly aware of the majority of the counts charged in the superseding indictments from the time when the first indictment was filed. To support that belief, Huertas' counsel relied on the fact that Huertas had admitted to several carjackings in addition to the Bryant Myers incident during his post-arrest interview with Rosado. Counsel contended that the government's seeking of several successive indictments was therefore a tactic designed to delay. But, as the government indicated in response, Huertas did not admit to all the offenses charged in the

Second, Huertas says that the "government's decision to charge multi-defendants[] for the same murders" was designed to cause unjustifiable delay. Parrying this assertion, the government again has an apt response: It notes that this court has previously explained in the speedy trial context that "the joint prosecution of defendants involved in the same [crimes]" is nothing abnormal, and that we have reasoned further that such joinder "is justified as a means of serving the efficient administration of justice."[22] Casas, 425 F.3d at 34. As before,

superseding indictments during the interview with Rosado (most notably, he did not admit to the kidnapping resulting in death of L.S.M.), nor did he reveal all his would-be compadres.

[22] The government notes too, perhaps less aptly, that Huertas could have, but did not, move to sever any of the counts or to sever his trial from that of his codefendants who he now complains proceeded alongside him, a fact which the government asserts renders much of the delay relative to the joint prosecution attributable to Huertas. See United States v. Santiago-Becerril, 130 F.3d 11, 22 (1st Cir. 1997) (noting that the appellant "never sought relief from delays occasioned by his codefendants by requesting a severance" when considering the reasons for delay in the case). But we will not weigh the fact that Huertas did not file a motion to sever against him in our ultimate speedy trial calculus, because the Santiago-Becerril case referenced by the government to support its proposition that we should do so did not go so far. See id. In that case, the court merely noted "Santiago never . . . request[ed] a severance," to support its conclusion that "the various delays were each justified by 'a valid reason,'" id. (quoting Barker, 407 U.S. at 531), but the court did not point to the lack of a motion to sever as evidence that the delay was attributable to Santiago. Because Santiago-Becerril does not support weighing against Huertas the fact that he "never sought relief from delays occasioned by his codefendants by requesting a severance," and because the government provides no other precedent or meaningful explanation as to why we should hold that fact against him, we will not. Nor do we weigh against Huertas that he joined his comrades' motions for continuances, as the government

Huertas has little to say in response to the government's contention that its decision to pursue a joint prosecution is not weighed against it. Thus, without any reasoned, oppositional argument from Huertas providing an explanation as to why this case is different from the run of cases where the joint prosecution of codefendants involved in the same crimes did not weigh against the government on the speedy trial score, we decline to find that the government's decision to bring a joint prosecution weighs against it here. See Lara, 970 F.3d at 82; Casas, 425 F.3d at 34; Vega-Molina, 407 F.3d at 533.

Third, Huertas claims "that [this] case[] w[as] unnecessarily complicated by charges of murder, and, initially[,] the demand for death sentences, that should not have been pursued and were ultimately rejected." Thus, he says the delay caused by the death penalty review process should be attributed solely to the government. Before we embark on our analysis on this liminal strand, it cannot go without saying first that "[d]eciding whether [to] seek the death penalty for a defendant is one of the government's gravest responsibilities." See United States v. Duran-Gomez, 984 F.3d 366, 375 (5th Cir. 2020). In accord with the gravity of the responsibility, as a general principle of prudence, courts have rightly opined that "[t]he path to decision

_____

filed such motions too -- so culpability for continuances, we believe, shakes out in the wash.

- 50 -

should be proportionately ruminative." Id.; see Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (explaining that the death penalty "qualitatively" differs from life imprisonment and that "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"); see also Ewell, 383 U.S. at 120 (explaining that one of the reasons the speedy trial right "depends upon the circumstances" is that "many procedural safeguards [are] provided [to] an accused"). Huertas, though, does not challenge the notion that death penalty review calls for unalloyed deliberation -- he says instead that the death sentence should not have been considered in this case in the first instance, and he asserts that any delay relative to the death penalty review hence falls at the government's feet. But we must reject Huertas' death penalty review related argument, as the record illustrates something quite different about the government's death penalty review process below.

There can be no dispute that Huertas was charged with capital offenses. As such, and as the government points out, under the Department of Justice procedures in operation at the time Huertas was charged with said crimes, the government was required to submit Huertas' case for death penalty review, regardless of whether the specific attorneys representing the United States in this case contemplated seeking the death penalty or not. See U.S.

Dep't of Just., Just. Manual § 9-10.010 et seq.[23]  That goes for the case underlying this appeal, where Huertas was ultimately found guilty of a capital offense, and the separate case charging Huertas with a capital offense where he was found not guilty -- a case which he complains improperly prolonged the delay too by introducing a second parallel death penalty review process which persisted after the review in the case underlying this appeal had concluded.  Huertas' argument that the government was wrong to initiate the death penalty review process as to either case below cannot succeed on these identified facts when Huertas has no response to the government's assertion that it acted in alignment with protocol, nor does he tell us why the government was wrong to do so.  And critically, Huertas fails to point to any evidence in the record indicating that the government acted in bad faith or without reasonable diligence during the review process once initiated, and he presents no argument otherwise to explain why the delay relative to the review should be weighed against the government.  See Colombo, 852 F.2d at 25.  As such, we will not

---

[23]  See id. § 9-10.060 ("Absent extenuating circumstances, prior to seeking an indictment charging a capital-eligible offense, the United States Attorney or Assistant Attorney General shall submit the case for review pursuant to the provisions of this Chapter."); see also id. § 9-10.040 (explaining that "[i]n the event the Attorney General determines the death penalty will be sought in a particular case, the Capital Case Section can provide valuable litigation advice and support, as well as trial assistance" (emphasis added)).

weigh any delay deriving from the death penalty review against the government.[24]

Because we conclude that the delays in this case cannot be placed squarely on the shoulders of one side or the other, the second, focal factor weighs neutrally in our analysis.

### iii. Assertion of the Right

It is undisputed that Huertas did not assert his speedy trial right below, which is the third Barker factor's concern. We have explained in previous cases that "[a]lthough a defendant 'has no duty to bring himself to trial' and does not waive his Sixth Amendment claim by not raising it in district court, he does have some responsibility to assert his speedy trial [right]." Perez-Cubertier, 958 F.3d at 91 (quoting Look v. Amaral, 725 F.2d 4, 6-7 (1st Cir. 1984)). Huertas failure to meet this responsibility means that the third Barker criterion weighs heavily against him, "mean[ing] . . . he must make a much stronger showing on the other factors in order to succeed in his claim." Rashad, 300 F.3d at 34.

---

[24] In addition to rebutting Huertas' argument that the delay relative to the death penalty review process was attributable to the government, the government also asserts that "the record . . . places blame at the feet of the pandemic and Huertas himself" for the delay, pointing to the informative motion Huertas filed below wherein he indicated to the district court that he needed additional time to prepare a mitigation investigation due to the COVID-19 pandemic. Nevertheless, just as we have not weighed delay attributable to the COVID-19 pandemic against the government, we will not weigh any such delay against Huertas.

### iv. Prejudice

"The prejudice prong seeks to protect three interests: avoidance of oppressive pretrial incarceration, minimizing anxiety and concern, and limiting the possibility that the defense will be impaired." Carpenter, 781 F.3d at 614. Of these three interests, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Reyes, 24 F.4th at 30 (quoting Barker, 407 U.S. at 532). Howbeit, "[a]s a general rule, the defendant bears the burden of alleging and proving specific ways in which the delay attributable to the [government] unfairly compromised his ability to defend himself." Rashad, 300 F.3d at 34. In the case at hand, for reasons we will tell, Huertas fails to meet his burden[25] to show any impingement on that most-important third interest (impairment of his defense) relative to the fourth Barker factor, which his favorable showing on the two others cannot overcome.[26]

---

[25] We have explained in the past that factor-four prejudice in the speedy trial analysis, while distinct from factor-one prejudice, may sometimes similarly be presumed "[i]n aggravated cases, involving grossly excessive delay," meaning factor four can favor a defendant without an actual demonstration of prejudice to any of the three protected interests we've described above. Rashad, 300 F.3d at 34. However, that presumption is neither "automatic or inexorable," nor is it warranted in every case. Id. at 41. Here, Huertas makes no presumptive prejudice argument relative to the fourth factor, so we need say no more.

[26] The government concedes that the first two factors of the prejudice prong -- avoidance of oppressive pretrial incarceration and minimizing anxiety and concern -- weigh "somewhat in Huertas'

Huertas' argument that his ability to defend himself was somehow hampered rises and falls on the supposed "failure of the many witnesses to recall events that impacted the trial."[27]  That position has evident holes.  For starters, Huertas does not call out any testimony where a witness failed to recollect information.  While Huertas does note that "several victims could not and did [not] identify [him]," he does not show that those victims would have been able to identify him even had the trial happened the same day as the crimes.  Remember, Huertas' modus operandi was to tell his victims:  "Don't look."  And even if it may be true that witnesses had forgotten things by the time Huertas went to trial, Huertas does not "alleg[e] and prov[e] [the] specific ways" these lapses in memory prejudiced his defense.  See Rashad, 300 F.3d at 34.  Huertas even concedes himself that this court and the Supreme Court have recognized that evidence of "clouded recollection" alone is not evidence of prejudice.  Id. at 42-43; see Loud Hawk, 474 U.S. at 315 (explaining that diminished witness recall resulting from delay "is a two-edged sword . . . [because] [i]t is the Government that bears the burden of proving its case beyond a

favor," because Huertas suffered a lengthy pretrial incarceration in anxiety-inducing pandemic conditions.

[27] Huertas also argues, without any citation to the record, that he was held "without contact from his attorneys to prepare for trial during [the] pretrial period."  We cannot credit Huertas' telling when it comes to us without any support.

reasonable doubt").  Considering that concession, considering that the burden to show prejudice to his defense laid with Huertas, and considering the paltry evidence and argument he marshaled, we do not see any prejudice to Huertas defense, and we will not weigh this factor against the government.

### v. Our Weighing of the Factors

With everything now said, and bearing in mind that Huertas' speedy trial claim comes before us on plain error review, we can dispense with his grievance with dispatch.  Because Huertas failed to assert his speedy trial right below, "mean[ing] . . . he must make a much stronger showing on the other factors in order to succeed in his claim," Rashad, 300 F.3d at 34, and because he made no such showing, as we have just shown, our appraisal of the factors identified by the Supreme Court in Barker reveals that the district court did not err, let alone plainly, in permitting the government's case to proceed despite the fifty-one-month delay between when Huertas was first indicted and when he ultimately went to trial, with Pizarro, with the third superseding indictment in operation.

### B. Sufficiency of the Evidence

Now, on to the evidence revealed at trial, which we have already drawn in fine detail, and which both cousins complain, for reasons we will explore, was insufficiently probative to convict them of the offenses charged.  Properly preserved

sufficiency-of-the-evidence challenges, such as the cousins', are reviewed de novo. See United States v. Buoi, 84 F.4th 31, 37 (1st Cir. 2023). Nevertheless, our review still imposes upon such a claim "an uphill battle on appeal." United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000). An appellant must show that after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt. United States v. Falcón-Nieves, 79 F.4th 116, 123 (1st Cir. 2023). This court will reverse an appellant's convictions on sufficiency-of-the-evidence grounds only if they can meet their burden to illustrate that such a dearth persisted below. See United States v. Andujar, 49 F.3d 16, 20 (1st Cir. 1995). Should this burden be met, the government is precluded from again trying that individual for the same offense. See Burks v. United States, 437 U.S. 1, 11 (1978) (explaining that "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding"). In the instant case, we need not restage all the dramatic facts that could bear upon our analysis to conduct our inquiry -- we can go directly to the heart of the matter instead.

The core sufficiency challenge, which both Huertas and Pizarro mount, relates to the carjacking charges, and it revolves

around the Supreme Court's holding in <u>Holloway</u> v. <u>United States</u>, 526 U.S. 1 (1999), where the Court explained that the mens rea element required to sustain a conviction for federal carjacking "requires the Government to prove beyond a reasonable doubt that the defendant would have at least attempted to seriously harm or kill the driver if that action had been necessary" to take the car, <u>id.</u> at 11-12; <u>see</u> 18 U.S.C. § 2119 (the applicable federal carjacking statute).[28]  The cousins argue, sketchily, without much citation to the record, that their appropriation of vehicles by force as here was of a "garden variety" outside of the statute's coverage, and they say that all the carjacking counts must fall for that reason.[29]  <u>See</u> <u>United States</u> v. <u>Guerrero-Narváez</u>, 29 F.4th

---

[28] The elements of the offense are: "(1) taking . . . from the person or presence of another; (2) a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce; (3) through the use of force, violence, or intimidation; (4) with the intent to cause death or serious bodily harm." <u>United States</u> v. <u>Garcia-Alvarez</u>, 541 F.3d 8, 16 (1st Cir. 2008).

[29] In addition to arguing that the carjackings occurred without the requisite intent as a matter of fact, the cousins also argue that the "degree and type of injury contemplated by § 2119," as a matter of law, is of a magnitude more significant than the injuries contemplated by the government in bringing the federal carjacking charges against them.  That legal argument goes nowhere though, because the cousins also acknowledge "there can be no challenge at this point" that the district court, whose decision we review, not the government's, "inform[ed] its reading of the carjacking statute's intent element" correctly.  In other words, because the cousins concede that the district court correctly understood the relevant law, and because the cousins advance no argument that the district court presented the law improperly, to the jury or otherwise, their argument about the government's beliefs on the law lacks potency.

1, 10 (1st Cir. 2022) (explaining that the federal carjacking statute covers "'a particular type of robbery' with the goal of deterring especially violent crime" (quoting Holloway, 526 U.S. at 8-9)). Within the broad aperture of that argument capturing all of the carjacking counts, the cousins only zoom in and make specific assertions explaining why their actions failed to satisfy the mens rea element of the statute as to one carjacking offense: the taking of Bryant Myers' BMW X6. Accordingly, we conclude that any challenge targeting the mens rea requirement as to the remainder of the carjacking counts is waived, and we focus our analysis on the cousins' state of mind during the Bryant Myers incident as illustrated by the evidence.[30] See Zannino, 895 F.2d at 17.

The cousins contend that the trial evidence related to the taking of the BMW X6 was insufficient to prove the requisite mens rea because "there [was] no testimony that Huertas" -- who ultimately drove off with the vehicle, with Pérez in tow, after

---

[30] While we decline to reach the cousins' perfunctory complaints relative to the mens rea element appending to the carjackings outside of the carjacking of Myers' X6, we note that our rehearsal of the evidence reveals that the cousins would struggle to mount a successful challenge as to those counts as well, because the evidence tends to show that the men brandished weapons and made serious threats from behind a guns' barrel on all occasions. See Guerrero-Narváez, 29 F.4th at 10 ("We have held that touching or threatening a victim while brandishing a firearm is sufficient evidence of intent 'to cause death or serious bodily harm' within the meaning of § 2119.").

- 59 -

the basketball-court scuffle -- or the other defendants "were even demanding the motor vehicle."  Such is so, the cousins say, because Peréz, the concerned mother, who was begging for the men to leave her son alone at the time the vehicle was taken, supposedly "voluntarily entered into the car and voluntarily show[ed] [Huertas] where the keys [were] and ho[w] to operate the BMW car of her son Myers, incidentally to the kidnapping of Mr. Myers."  The cousins' position is that these facts, in and of themselves, demonstrate why there was no showing of any intent to cause serious bodily harm,[31] but the record evidence viewed in the light most favorable to the prosecution, as the government points out, does not paint the same picture.[32]

---

[31] Intermingled with their mens rea argument, the cousins also offer a few scattered words against the jury's conclusion that they stole the X6 "through the use of force, violence, or intimidation" -- the third element of the federal carjacking statute.  Garcia-Alvarez, 541 F.3d at 16.  While the cousins' no-force-violence-or-intimidation argument is likely waived for lack of development, see Zannino, 895 F.2d at 17, our alighting on the record will nevertheless show that the alternative argument is unavailing.

[32] In addition to confronting the cousins' presentation of the facts, the government also correctly points out from the law's perspective that, even if the taking of the BMW X6 was "incidental[] to the kidnapping of Mr. Myers," and even if no demand was made for the vehicle as a matter of fact -- as a matter of law, "nothing in the statute requires that the taking of a motor vehicle be an ultimate motive of the crime," see United States v. Rivera Figueroa, 149 F.3d 1, 4 (1st Cir. 1998), and a demand is not an element of the carjacking offense (although the use of force, violence, or intimidation is), see Guerrero-Narváez, 29 F.4th at 9.  Therefore, the government says, whether the cousins made a demand, whether the carjacking was incidental, the evidence

So, what did the trial evidence show about the cousins' state of mind when they jacked Myers? Agent Rosado certainly testified that Huertas admitted during a post-arrest interview that he had begun planning to confront Myers some days in advance of the incident, and Villegas testified similarly that Huertas, Pizarro, and Cepeda had planned the encounter in advance because they had misgivings with Myers related to the death of their cousin Corroro. Huertas also apparently admitted during the interview with Rosado, according to Rosado, that at least one of the individuals who accompanied him to confront Myers demanded the keys to Myers' X6 during the basketball-court interaction. Those testified-to facts cut against the cousins' contention that the X6 fell into their hands incidentally due to happenstance and Pérez's will alone. Peréz, on her occasion to tell the tale of the carjacking, plainly testified for her part on point that she only gave up the keys to the BMW X6 after the men had broken her phone as she attempted to contact the police, and after "[one of] the guy[s] . . . started asking where the keys to the BMW [were]," which puts a further damper on the cousins' constructed narrative that no demand was made. And all of this back and forth happened, according to Villegas, Luyando, and Myers' testimony, only after the group of men had hit, bludgeoned, and dragged Myers by the

_____

presented here plainly meets the legal charge as to the theft of the X6 (and as to all the other carjackings as well).

hair into their earlier-stolen Kia Sportage to take him away, while struggling with Pérez to break her unrelenting grip on her child all along, aiming weapons at them both throughout, and even firing a shot in the air at one point. Considering these identified facts held against the record in toto, we cannot adopt the cousins' preferred inference that Pérez was under no threat and that her relinquishing of the keys was therefore voluntary and attributable solely to her own choices rather than the cousins' desire for the X6 and intimidating demand for as much. We find on these facts instead that the jury was presented sufficient evidence to conclude that the cousins committed the criminal acts possessing the requisite intent to cause serious bodily harm if necessary to acquire the vehicle belonging to Myers. See Guerrero-Narváez, 29 F.4th at 10. To be sure, while Luyando and Villegas explained that it was Huertas who ultimately drove off in the X6 with Pérez, the cousins neglected to squarely argue that Pizarro could not be held liable as an aider and abettor in the offense insofar as Huertas is subject to liability as the principal,[33] so any such argument is waived, and Pizarro remains on the hook for the Bryant Myers incident too.[34] See Zannino, 895 F.2d at 17.

---

[33] The district court instructed the jury that it could find Huertas and Pizarro liable for the charged offenses under an aiding-and-abetting theory, and there is no argument before us that such an instruction was inappropriate.

[34] While we find the argument waived, we note on the topic, nevertheless, that the evidence illustrated Pizarro associated

We move on to the cousins' non-mens rea arguments, which were all presented to us in a cursory and clumped-together fashion -- arguments directed at the remainder of the carjackings and the kidnapping resulting in the death of L.S.M. They say that there was "no physical evidence" to connect them to the charged offenses; they complain that only Luyando and Villegas identified Pizarro in open court, and that only Luyando, Villegas, and Barreras identified Huertas in open court; and they take issue with the veracity of Luyando's and Villegas' testimony overall, considering their once-comrades had something to gain from playing the role of the cooperating witnesses during the trial.[35] Be that as it may, none of the cousins' arguments are sufficient to compel

himself with the criminal venture and that he participated in the assault on Myers and Pérez resulting in the taking of the X6 as something he wished to bring about. See United States v. Monteiro, 871 F.3d 99, 109 (1st Cir. 2017) (explaining that "[t]o establish aiding and abetting liability, the government must prove beyond a reasonable doubt that the defendant 'associated himself with the venture,' 'participated in [the venture] as something that he wished to bring about,' and that he 'sought by his actions to make the venture succeed'" (quoting United States v. Negrón-Sostre, 790 F.3d 295, 311 (1st Cir. 2015))).

[35] The cousins also offer a few words against the jury's conclusion that they stole the relevant motor vehicles "through the use of force, violence, or intimidation" -- the third element of the federal carjacking statute. See Garcia-Alvarez, 541 F.3d at 16. However, because the cousins fail to drill down and illustrate with citations to the record, which of the numerous charged carjackings they are challenging and why, and because the record tends to show that force, violence, and intimidation were employed on all occasions, see supra note 30, the cousins' argument is unavailing.

- 63 -

the reversal of any of the identified counts on the record here, for reasons we now explain.

As for the general challenge the cousins raise against the veracity of the cooperating witness testimony, wherein they rely primarily on the mere fact that Villegas and Luyando testified pursuant to an agreement with the government to impugn their credibility, we have previously explained that "a defendant cannot win a sufficiency-of-the-evidence challenge by claiming . . . the witnesses against him were not credible."  United States v. Maldonado-Peña, 4 F.4th 1, 54 (1st Cir. 2021).  That principle applies whether witnesses testify pursuant to an agreement with the government or for some other reason.  See United States v. Velazquez-Fontanez, 6 F.4th 205, 217 (1st Cir. 2021) (explaining that "[an appellant] errs in claiming that the government's reliance on cooperating witness testimony necessarily undermines the sufficiency of the evidence").  In other words, in view of our caselaw, the cousins' cooperating witness argument wilts and burns.  As for the issues the cousins raise with the identification evidence, this court has emphasized that such "evidence is for the jury in all but 'extraordinary cases.'"  See United States v. De León-Quiñones, 588 F.3d 748, 753 (1st Cir. 2009) (quoting United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003)).  And neither cousin isolates anything extraordinary about the evidence presented to the jury here to show us why we should depart from

our typical course in this case, so we decline to do so. Last, on the lack of physical evidence, which was not so lacking as the cousins contend,[36] we have explained in previous cases that such evidence is not necessary to support a conviction. See United States v. Cruz-Rodriguez, 541 F.3d 19, 27 (1st Cir. 2008) ("Lack of physical evidence does not render the evidence that is presented insufficient." (quoting United States v. Magallanez, 408 F.3d 672, 681 (10th Cir.2005))). So that argument fails too. And that's all folks. With everything told, this court is unmoved to upend the jury's verdict; the cousins' sufficiency-of-the-evidence challenges fail.

## C. Double Jeopardy

The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Huertas contends that the Fifth Amendment's proscription was violated when he was put to trial by the government simultaneously for a violation of 18 U.S.C. § 924(j) and its lesser included offense, 18 U.S.C. § 924(c) -- charges which related to the kidnapping

---

[36] For example, members of the government's forensics team testified relative to the kidnapping resulting in death of L.S.M. that the weapon-related evidence collected at the scene of the crime aligned with what the evidence tended to show about Huertas and Pizarro's arsenal, and a burned Infiniti matching the description of a vehicle testimony illustrated Huertas and Pizarro had carjacked earlier in the criminal chain of events was found at the scene also.

resulting in death of L.S.M.[37]  See United States v. García-Ortiz, 657 F.3d 25, 28 (1st Cir. 2011) (explaining that 18 U.S.C. § 924(c) -- discharge of a firearm in furtherance of a crime of violence -- is a lesser included offense of 18 U.S.C. § 924(j) -- discharge of a firearm in furtherance of a crime of violence causing murder).  Huertas, who raises his double jeopardy grievance for the first time before us rather than below, concedes that we review his unpreserved claim for plain error. See United States v. Stefanidakis, 678 F.3d 96, 99 (1st Cir. 2012).

The government does not challenge Huertas' assertion that, under the Double Jeopardy Clause, he may not be punished for violating both § 924(j) and § 924(c) as § 924(j)'s lesser included

---

[37] Huertas also appears to attempt to raise a due process challenge against the jury instructions and verdict form.  In so doing, he asserts that, because the original verdict form submitted to the jury was incorrect -- as acknowledged (and addressed) by the district court -- the double jeopardy error he alleges "taken in concert with the erroneous jury verdict form, [which] raised valid questions during jury deliberations, created jury and trial confusion and affected [his] substantive right at a fair trial." So be it, because Huertas fails to identify with any amount of clarity what the confusion affecting his substantive right to a fair trial attaching to the district court's instructional error was, and considering the error was undisputedly corrected before the jury rendered its verdict (and after Huertas' attorney indicated she agreed with the correction), and in light of the fact that Huertas cites no caselaw in support of his position that his fair-trial rights were violated, we find Huertas' due process argument about error in the jury instructions and verdict form waived.  See Zannino, 895 F.2d at 17; see also United States v. Serrano-Delgado, 29 F.4th 16, 29 (1st Cir. 2022) (explaining that an issue may also be waived if counsel's own conduct invited the trial judge's ruling).

offense.  Rather, it tells us, correctly, that the Supreme Court has established that "the [government] is not prohibited by the Double Jeopardy Clause from charging [a defendant] with greater and lesser included offenses and prosecuting those offenses in a single trial."  Ohio v. Johnson, 467 U.S. 493, 500 (1984). Instead, "the Double Jeopardy Clause prohibits prosecution of a defendant for a greater offense when he has already been tried and acquitted or convicted on the lesser included offense."  Id. at 501.  On those occasions where a defendant is convicted of an offense and its lesser included charge in a single trial, "the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense."  Brown v. Ohio, 432 U.S. 161, 165 (1977).

Against this constitutional landscape plotted by the Supreme Court and endorsed by the government hither, Huertas descants that the district court plainly erred in allowing the 18 U.S.C. § 924(j) charge and the 18 U.S.C. § 924(c) charge to go to the jury.  However, in so doing, Huertas fails to provide any citations to controlling precedent spelling out reversible double jeopardy error under circumstances such as his: where the count charging a lesser included offense was dismissed prior to the district court's imposition of a sentence.  Such failure is fatal to Huertas' double jeopardy claim under the applicable plain error

standard.  See United States v. Rivera-Carrasquillo, 933 F.3d 33, 55 (1st Cir. 2019) (explaining that to establish plain error, an appellant bears the burden to prove that the error is "indisputable . . . given controlling precedent" (quoting United States v. Morosco, 822 F.3d 1, 21 (1st Cir. 2016))).  With that, we move on.

### D. Sentencing[38]

We now near the end of our appellate endeavor.  Our last assignment is to review Pizarro's argument that his sentence -- life in prison plus more -- is unreasonable.[39]  Pizarro avers that the sentence imposed upon him was so because the district court improperly weighed certain unidentified mitigating factors, because it disregarded certain unidentified others, and because the sentence ultimately selected by the court was just too

---

[38] We draw the relevant facts describing Pizarro's sentencing hearing primarily from the presentence investigation report and the hearing transcript.  Cf. United States v. Larios, 593 F.3d 82, 85 (1st Cir. 2010) ("We draw the facts . . . where appropriate, [from] the sentencing hearing transcript.").  And we narrate the facts "largely in equipoise."  Burgos-Montes, 786 F.3d at 99 n.1.

[39] "Appellate review of claims of sentencing error [typically] entails a two-step pavane."  United States v. Matos-de-Jesús, 856 F.3d 174, 177 (1st Cir. 2017).  Within this bifurcated framework, we usually "first determine whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable."  United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011).  In the instant case, however, because Pizarro -- as we will show -- only maintains a claim of substantive reasonableness, "we therefore confine our review to the issue of substantive reasonableness."  See United States v. Flores-Nater, 62 F.4th 652, 655 (1st Cir. 2023).

long.  As to the first two noted contentions, the government points out correctly that they were not raised before the district court, and as such are at best subject to plain error review.[40]  The last complaint, however, was raised in that venue, so we will review Pizarro's preserved challenge targeting the reasonableness of the sentence's length under the more appellant-amicable abuse of discretion rubric.  See Holguin-Hernandez v. United States, 589 U.S. 169, 171 (2020) (explaining that an "argument for a specific sentence" less than that imposed by the district court "preserve[s] [a] [substantive reasonableness] claim on appeal that the [imposed] sentence was unreasonably long"); United States v. Colón-De Jesús, 85 F.4th 15, 24 (1st Cir. 2023) (reviewing for plain error certain substantive reasonableness arguments related to mitigating factors when the appellant "did not object to the substantive reasonableness of his sentence below"); see also United States v. Pantojas-Cruz, 800 F.3d 54, 58 (1st Cir. 2015) (explaining as a general matter that "[i]f a defendant . . . 'fails to preserve an objection below, the plain error standard supplants the customary standard of review'"

---

[40] Pizarro confoundingly asserts that the noted sentencing challenges were preserved below because "in this case [he] did raise the governmental cooperation argument before the district court."  Whatever Pizarro may mean by that, the record plainly shows that he made no objection during the sentencing whatsoever beyond his argument that he should receive a sentence less than life of "40 or 50 years."

(quoting United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010))).

While Pizarro recognizes relative to his two unpreserved reasonableness arguments that "when [an] [a]ppellant [such as him] has failed to raise his claims below, he or she is required to overcome plain error," he does not engage in any plain error analysis in his opening brief relative to those two assertions, nor does he do so in his reply brief, which was penned at least with the benefit of knowing that the government argued the appellant-unfriendly standard applies here.[41]   "And, because [Pizarro] failed to argue the plain error standard in his opening brief [and his reply brief to boot], his . . . [first two] challenges to the . . . reasonableness of his sentence," which relate to the court's consideration of unidentified mitigating factors, are waived. Colón-De Jesús, 85 F.4th at 25. So, we advance to review the reasonableness of the life sentence, focusing narrowly on Pizarro's preserved substantive argument about its duration.

Because any challenge faulting the district court's weighing of the relevant factors or lack thereof is waived, see

---

[41] Not only does Pizarro fail to engage in the requisite plain error analysis relative to his claims, he also neglects to identify even a single mitigating factor which the district court improperly weighed or disregarded in its decision, which is another basis for waiver. See Zannino, 895 F.2d at 17.

supra note 40; see also Colón-De Jesús, 85 F.4th at 25, in order to determine whether the duration of the sentence imposed upon Pizarro was reasonable, we ask simply whether the sentence's length is defensible and based in a plausible rationale, see id. at 26; see also United States v. Colcord, 90 F.4th 25, 30 (1st Cir. 2024) (explaining that "[a] sentence is substantively reasonable if its rationale is plausible and resulted in a defensible outcome").  We have explained time and time again on this topic that a sentencing outcome is defensible so long as it is part of the universe of reasonable sentences.  See Clogston, 662 F.3d at 592.  And, here, the district court imposed a sentence within what Pizarro concedes were the properly-calculated guideline ranges as to all crimes of conviction, which affords the sentence a presumption of reasonableness for Pizarro to overcome, see United States v. Ortíz-Mercado, 919 F.3d 686, 691 (1st Cir. 2019), placing pressure on him requiring a "heavy lift" to repulse, United States v. De Jesús-Torres, 64 F.4th 33, 41-42 (1st Cir. 2023) (explaining that "[i]n virtually all cases, a within-guidelines sentence will be a defensible outcome").  And as Pizarro treks uphill to confront his life sentence, he does not even begin to explain with any manner of specificity why, considering -- as the district court did in divining its sentence -- the gruesome nature of the offenses, his more-than-minimal criminal background, and the other § 3553 factors the court cited, the life sentence imposed upon him is

beyond the universe of reasonableness. See Clogston, 662 F.3d at 593 (explaining that there is a latitude implicit in a sentencing court's task to select a reasonable sentence, and reasoning therefore that "[s]entencing is much more an art than a science," which we are reluctant to "substitute [our] judgment for" on appeal). Pizzaro's failure to explain ends the matter, and his sentence remains standing, as does his cousin Huertas'.

## OUTCOME

All that's left to be said is: **we affirm**.